Lesly Cohen v. Commissioner.
Cohen v. Commissioner
Docket No. 46719.
United States Tax Court
T.C. Memo 1957-172; 1957 Tax Ct. Memo LEXIS 78; 16 T.C.M. (CCH) 763; T.C.M. (RIA) 57172; September 12, 1957
*78 Held: 1. That, where petitioner received almost all of his income from the illegal operation of a "betting commissioner" enterprise, and kept no permanent records of his transactions in that capacity, respondent's use of the bank deposit method in determining petitioner's income was not arbitrary or invalid. 2. That certain losses from gambling are to be allowed to the extent of gambling gains. 3. That petitioner understated taxable income on his returns for each of the years 1948, 1949 and 1950. Amounts of understatements determined. 4. That a part of the deficiency in each of the years 1948 through 1950, inclusive, was due to fraud with intent to evade taxes. John V. Lewis, Esq., and Clyde C. Sherwood, Esq., 703 Market Street, San Francisco, Calif., for the petitioner. Charles W. Nyquist, Esq., for the respondent. FISHER
Memorandum Findings of Fact and Opinion FISHER, Judge: This proceeding involves deficiencies in income tax and additions to tax determined against petitioner as follows: Sec. 293(b)
Year
Deficiency
Addition to Tax
1948
$ 538,911.40
$269,455.70
1949
426,038.44
213,019.22
1950
228,561.34
114,280.67
Total
$1,193,511.18
$596,755.59
*79 The issues presented for our consideration are: (a) whether respondent's use of the bank deposit method was justified; (b) whether certain losses from gambling are to be allowed to the extent of gambling gains, (c) whether, and to what extent, petitioner omitted taxable income from his return for each of the years 1948, 1949 and 1950; and (d) whether any part of the deficiency for each of the years in question is due to fraud with intent to evade tax. Findings of Fact Some of the facts are stipulated and to the extent so stipulated are incorporated herein by reference. Petitioner, Lesly Cohen, during the taxable years in controversy herein, resided in San Francisco, California, and was unmarried. Petitioner filed his individual tax returns for the calendar years 1948 through 1950, inclusive, on a cash basis with the then collector of internal revenue for the first district of San Francisco, California. Lesly was born and educated in San Francisco. He worked on a local newspaper, the San Francisco Bulletin, as a copy boy, and eventually became a sports writer and member of the sports staff. About 1934, when the Bulletin was sold to another publisher, petitioner became a free-lance *80 writer on sports subjects, editing boxing magazines and doing publicity work for various athletic events. During the taxable years in question, petitioner lived modestly in his mother's home with two brothers and two sisters. During World War II, Lesly was inducted into the United States Army. Upon his discharge, he returned to California and soon thereafter became acquainted with Coplin who owned and operated the Kingston Club, (111 Ellis Street) in San Francisco. A "card room" was maintained as part of the club's operations. The same premises were used by Coplin for his "betting commissioner" business, which consisted largely of placing bets on horse races on a commissioner basis. The latter venture was in violation of both State and local law. Coplin, desirous of expanding his gambling activities to embrace other athletic events, invited petitioner to join his betting commissioner enterprise as a limited partner. In the latter part of 1947, Coplin died, and about January 1948, Lesly took over the operation of the Kingston Club. Thereafter, until the latter part of 1951, when the Federal Gambling Stamp Tax law was put into effect, Lesly operated the club's card room and betting *81 commissioner activities as sole proprietor. During the years 1948, 1949 and 1950, Lesly's activities as betting commissioner included not only horse racing, but other sports events. He was unable to estimate what proportion of the bets handled by him grew out of horse racing and what out of other sports events. Petitioner's activities as betting commissioner, and his operation of the card room were his only income-producing activities during the years in question, other than a small amount of income derived from investments in securities with his brother Herbert. In his personal gambling activity at the Film Row Club, his losses exceeded his gains. The gains and losses from his limited activities as bookmaker about balanced each other. Petitioner's primary function as betting commissioner was to obtain opposite parties to a wager, receiving for his services a "commission" or fixed percentage of the amount involved in the wager. Ordinarily, Lesly would quote prevailing odds on horse races and other athletic events and if a customer wished to make a wager, petitioner would attempt to locate others to accept or "cover the bet" in the same amount. Normally, petitioner did not accept *82 a wager as "placed" until he had found some other individual to "lay off" the other side of the same event. When petitioner was able to "lay off" the entire amount of the bet, petitioner's profit or loss would not depend upon the outcome of the event, but would be a fixed percentage or "commission" of the total wager, which petitioner retained on each bet. When able to do so, petitioner would lay off the bet with one or more of his own local customers. When this could not be accomplished, he would lay off or cover the bet with other betting commissioners in the San Francisco Bay area and in other cities. He would not bring the customers betting on opposite sides of the same transaction into personal contact so that they could bet with each other. When Lesly located a client willing to accept the other side of a bet, he would confirm acceptance of the wager by telephone. Lesly was personally responsible for the collection of all betting commitments which he made, and had to pay the winner even if he was unable to collect from the loser. Petitioner watched his credits closely. The commission to petitioner on bets handled for his own customers was 5 per cent on each bet handled by him, *83 except that on horse racing bets only the loser paid a commission. These commissions were not split. On bets laid off with other betting commissioners, the commission was usually split, half going to petitioner. At times, he found it necessary to waive his entire commission in order to get the bet laid off with another betting commissioner. Occasionally, through miscalculations on petitioner's part, or other unforeseen circumstances, he accepted a bet and could not arrange to lay it off. He then found it necessary to carry the other part of the bet. On these occasions, he acted as bookmaker to the extent that he himself carried the bet. Except for such occasional instances, he did not carry any part of the bet himself. Petitioner's betting commissioner enterprise was operated almost entirely on a credit basis. Comparatively insubstantial amounts of money were actually posted with petitioner prior to the happening of the event which determined the wager. Normally petitioner collected cash from local bettors and paid local winners in cash. Cash settlements were made with local customers following the happening of the sporting event. Settlements with other commissioners in the San *84 Francisco area were likewise mainly in cash. Transactions with out-of-town betting commissioners were generally settled at periodic intervals by check. The periods varied, and included settlements on a daily, weekly or monthly basis, or when the account reached a certain fixed sum in favor of petitioner or the out-of-town broker. Such settlements were in effect the balancing of accounts between petitioner and out-of-town betting commissioners. They usually represented the net amount due from a number of bets rather than a single bet. When it was necessary for petitioner to remit to an out-of-town broker to settle an account, petitioner usually sent his own personal check. Occasionally he was required to send cashier's checks. Petitioner was unable to estimate what proportion of his betting commissioner transactions were with out-of-town brokers. The handling of bets of local customers as betting commissioner on a commission basis was a substantial part of petitioner's business. Petitioner maintained a "revolving fund" of about $3,000 in cash, which he used in making pay outs to local winners. Checks, most of which were received from out-of-town brokers, were either deposited in petitioner's *85 commercial bank account or were endorsed and transferred, or cashed by petitioner. The only cash deposits in petitioner's commercial bank account during the years in question were, in the aggregate, as follows: 1948 - $430; 1949 - $8,470; 1950 - $13,955. Petitioner received cash from local bettors far in excess of the foregoing amounts in each of said respective years. His records of cash transactions as betting commissioner were kept only a few days until settlement was made. He never furnished to his accountant any records of his cash transactions or cash commissions received as betting commissioner. In preparing data for petitioner's income tax returns for the years in question, neither the accountant who assembled the data nor the accountant who prepared the returns from said data took into consideration any undeposited cash. Throughout the years 1948, 1949 and 1950, petitioner maintained a commercial bank account in the name of "Les Cohen" at the Market-Ellis Branch of the Anglo-California National Bank, San Francisco, California, where he deposited funds relating primarily to his activities as betting commissioner. The total deposits to petitioner's commercial account in said *86 bank for each of the years involved herein were in the following amounts: Year
Amount
1948
$508,384.23
1949
404,118.69
1950
283,129.80
Said deposits largely represented receipts from other betting commissioners in settlement of accounts. The foregoing deposits consisted almost entirely of checks. During the entire threeyear period in question the total amount of cash included in said deposits (detailed supra by years) was less than $25,000. Deposits totaling $2,905 were made to said account on January 3, 1951. During each of the years in controversy, petitioner received a large number of checks payable to "Les Cohen" which were endorsed by him but not deposited. The total amounts thereof and the respective years in which received were as follows: 1948 - $120,974.75; 1949 - $107,712; 1950 - $22,613.75. These undeposited checks likewise largely represented settlement of accounts. Petitioner made payments by check in the settlement of accounts with out-of-town bettors totaling $292,283.46 in the year 1950. [1]
*87 During the taxable years in question, petitioner did not maintain any permanent or detailed records or formal books reflecting gross commissions or gross receipts and disbursements from his betting commissioner activities. Petitioner was apprehensive that the possession of such records would be both incriminating to him and embarrassing to his customers if they fell into the hands of law enforcement officers. For his own reference purposes, however, he kept a daily "master sheet" at the Kingston Club setting forth the transactions which he handled as betting commissioner. On a busy day, approximately 100 wagers were recorded thereon. After a day or two, when the master sheets had served their immediate purpose, they were destroyed to avoid possible seizure and use as evidence by police authorities. The effect of such destruction was likewise to render it impossible to make an accurate determination of the amount of his commissions received as betting commissioner. No record of such commissions was maintained by petitioner. Petitioner retained George T. Murton (formerly the accountant for the Kingston Club during the years Coplin operated the club) to maintain its records, and Murton, *88 or Evje, an accountant in Murton's firm, performed such service for petitioner during the years in question. Murton's procedure was to go to the Kingston Club at least once a month and take off the record of income and disbursements from the card room. He also collected memorandum sheets upon which the petitioner had noted daily cash expenditures. Receipts or paid bills were usually attached. Murton took the bank statements and canceled checks and reconciled the bank statements with the check book stubs. The books of account of the card room were either used at the card room by Murton or taken to his office and returned to the card room where they were kept. The bank statements, canceled checks, and memoranda of cash expenditures were kept by Murton either at his home or in his office. Murton compiled the results of his accounting work in a so-called ledger which was actually a compilation on columnar work sheets. Murton's method of arriving at petitioner's gross income at the end of each year was as follows: He subtracted the amount in the bank at the beginning of the year from the amount in the bank at the end of the year. He then added to the net increase or decrease *89 in the bank balance all of the expenses of the business and all of the withdrawals made by or for the petitioner. The result was considered petitioner's gross income from the Kingston Club. The accountants disregarded cash receipts (other than those deposited and reflected in the bank balance) and also disregarded cash pay outs except those pay outs substantiated by a memorandum from petitioner. This was done on the theory that the $3,000 revolving fund remained approximately the same throughout the period. From the gross income thus arrived at Murton would deduct the petitioner's deductible expenses. Petitioner did not inform Murton that he received a substantial amount of checks in each of the years in question in connection with his business as betting commissioner which he endorsed but did not deposit. For about five months in 1950, while Murton was ill, Evje acted in his place and followed the same methods. Evje never saw any books recording cash receipts or betting records relating to petitioner's activities as betting commissioner. Murton died some time in 1951. All business expenses listed on Murton's summaries and claimed as deductions on petitioner's returns were *90 allowed by respondent. Annual summary sheets were prepared by Murton and furnished to petitioner and mailed to Calegari, a certified public accountant who prepared petitioner's income tax returns. The summary sheets for the three years here involved were furnished by Murton to Calegari and were used by the latter in the preparation of said income tax returns. Calegari did not keep any books or records for the Kingston Club operations or for any of petitioner's betting commissioner activities. The only records maintained by Calegari relating to petitioner's financial affairs was a set of books for Lesly's investment in various stocks and bonds, which he held as a joint venturer or partner with his brother Herbert. In the preparation of petitioner's income tax returns for the years in question, Calegari was not given access to any books or records that may have been maintained with respect to the Kingston Club or for any of petitioner's betting activities. In preparing petitioner's income tax returns, Calegari relied on the annual summary sheets and profit and loss statements of the Kingston Club operations, which were sent to him by Murton. About the end of 1950, petitioner's *91 Federal income tax returns for the years 1948 and 1949 were audited by Internal Revenue Agent Parenti. The bank statements, cancelled checks and memoranda of cash expenditures referred to above, used in the preparation of the summary sheets for 1948 and 1949 by Murton, had been kept by the latter either at his home or in his office, and were made available to Parenti. Parenti based his examination of petitioner's returns for 1948 and 1949 entirely on information and data furnished by Evje of Murton's office. After Parenti audited petitioner's returns for the years 1948 and 1949, he prepared and filed a report indicating deficiencies as follows: 1948 - $5,505.67; 1949 - $4,689.23. At the time of the trial in the instant case, the bank statements and cancelled checks for the years 1948 and 1949 could not be found. Petitioner was able to produce only his cancelled checks for the last 11 months of 1950 and bank statements for the year 1950. In 1952, Internal Revenue Agent Glenn Adrian conducted an original examination of petitioner's return for 1950 and a reexamination of his 1948 and 1949 returns. At this time there was a nation-wide investigation of betting commissioners and others *92 engaged in gambling activities. As a result of this drive, Adrian had acquired, at the time of his investigation, photostats of checks paid to or endorsed by "Les Cohen," which had been received from other revenue agents' offices throughout the United States. Many of said checks had been endorsed and cashed by petitioner and had not been deposited in his commercial bank account. This information had not been available at the time of Parenti's examination. Adrian obtained authorization from the Commissioner of Internal Revenue for a re-examination of petitioner's returns for 1948 and 1949, and a copy of said letter was furnished to petitioner. At the beginning of his examination, Adrian contacted Calegari and was advised by him that petitioner's attorney had all of petitioner's existing books and records. Later, an agent of the Intelligence Division of the Internal Revenue Service communicated with petitioner's attorney and was informed that the attorney had all of Cohen's books in his office. In May 1952, Adrian caused a registered letter to be sent to petitioner requesting that he produce his records, and a followup letter was sent to petitioner in September of 1952. Petitioner *93 neither answered the letters nor produced his books and records. Thereafter, Adrian contacted petitioner's attorney who informed the agent that he would look at the records in his possession and would let Adrian know whether he could see them. Later the attorney informed Adrian that he had looked at the records and that he would not show Adrian anything. Adrian proceeded to make his audit on the basis of third-party records to the extent that they were available. The available records were (1) bank deposit tags which showed dates and amounts of deposits and a number identifying the banks on which the deposited checks were drawn, but no names identifying the makers of the checks; (2) copies of bank statements of petitioner's accounts showing total deposits, and amounts and dates of payment of checks drawn on the account, but without names or other identification of payees; (3) photostatic copies of checks payable to Les Cohen obtained from other internal revenue agents' offices; and (4) a transcript of an account on the books of the Film Row Club showing petitioner's wins and losses from personal bets at that club. Petitioner's wins and losses from gambling at the Film Row Club *94 were as follows: Year
Amount Won
Amount Lost
1948
$61,695.00
$79,075.00
1949
63,500.00
69,912.50
Respondent computed petitioner's taxable income for the years in question by the so-called bank deposit method. He determined that all monies deposited in the commercial bank and all checks received and endorsed but not so deposited (to the extent he had knowledge of them at the time the statutory notice was mailed) and all wins from the Film Row Club constituted income. Because of lack of substantiation, no deductions were allowed for pay outs or losses. None of the deductions claimed on petitioner's returns were disallowed. Revenue Agent Adrian did not attempt to compute petitioner's net income by the so-called net worth method because petitioner dealt in large sums of cash and the agent did not feel that he could accurately determine net worth for that reason and also because, having been refused petitioner's books, he would not know how petitioner made his investments. In petitioner's tax returns for 1948 through 1950, inclusive, on Schedule C, page 2 (profit or loss from business), the nature of the business was stated to be "brokerage." Gross profits *95 (listed as total receipts) from the Kingston Club operations are reported on petitioner's tax returns for the years 1948 and 1949 in the amounts of $56,795.13 and $66,274.91, respectively. On petitioner's original income tax return for the year 1950, he reported gross profit (listed as total receipts) from Kingston Club in the amount of $1,836.28, and a net loss of $26,687.91. On July 28, 1954, petitioner filed an amended return for the year 1950 on which he reported gross income (listed as total receipts) from Kingston Club of $8,207.71 and a net loss of $15,125.75. During the years involved herein, Lesly had a safe deposit box at the Bank of America, Day and Night Branch. During each of the taxable years in question, petitioner received substantial commissions in cash from local customers. His settlements with local betting commissioners were almost entirely in cash, and reflected his share of commissions. Petitioner's gross income from his activities as betting commissioner and the operation of the Kingston Club card room for the respective years in question did not exceed the following: 1948 - $167,000; 1949 - $145,000; 1950 - $108,000. Petitioner, in his income tax returns *96 for each of the years in question, substantially understated income from his activities as betting commissioner and the operation of the Kingston Club card room. A part of the deficiency for each of the years involved was due to fraud on the part of petitioner with intent to evade taxes within the meaning of section 293(b). Opinion Respondent's Determination Not Arbitrary Respondent determined deficiencies herein by treating as income for each of the years 1948 through 1950, inclusive, the full amounts of bank deposits made by petitioner to his checking account, certain undeposited checks received by him in each of said years which were cashed or endorsed and transferred by him to others, plus winnings (without allowing losses) by petitioner from gambling at the Film Row Club in the years 1948 and 1949. Part of the deficiency for the year 1948 represents interest in the amount of $159.12, which petitioner received in connection with a refund of Federal income tax, and which was not included in his reported income for that year. This item is not in dispute. It is conceded that petitioner carried on an extensive business during the years in question as a betting commissioner, *97 much of which was handled by cash transactions. It is also conceded that he maintained no records of commissions earned, bets placed, receipts (including cash) or pay outs (also including cash). Under the circumstances, we have no doubt that respondent was justified in making his determinations on the basis of the bank deposit method. In (C.A. 6, 1956), the Court said, in part (p. 188): "In the absence of the books and records of the Doll Lumber Company, the Commissioner was justified in treating the deposits in the bank account of H. A. Doll as gross income with the burden resting upon the taxpayer to show what amounts, if any, were nontaxable income, and what deductions, if any, should be properly credited against it. ; , certiorari denied ., , certiorari denied ; ; * *98 * *" See also , affd. per curiam (C.A. 9, 1954); (C.A. 9, 1956), affirming a Tax Court Memorandum Opinion [; . Petitioner complains that neither he nor his counsel even knew what information was the basis of respondent's determination until almost the close of the trial. If petitioner or his counsel deemed such knowledge significant to the preparation of the case, a motion should have been filed to require respondent to "file a further and better statement of the nature of his claim" under the provisions of Rule 17(c)(1) of this Court. Petitioner's brief argues that he was unaware, until the agent testified, that respondent had added to income the wins at Film Row Club, but had made no allowance for losses. (See discussion, infra.) The agent testified as to the amount of the losses, as well as the gains, however, and we have allowed the losses to the extent of the gains (see infra). We may add that petitioner made no motion to hold the record open for the production of additional evidence *99 on this issue on the ground of surprise. We are unaware of any prejudice to petitioner arising out of the circumstances alluded to in this paragraph. In any event, no steps have been taken by petitioner to remedy such prejudice if, by any chance, it existed. Petitioner's fundamental objection, however, is to the effect that respondent's determination was arbitrary and without rational foundation. Petitioner urges this view in two respects. The first is that respondent's determination was arbitrary because he included all gains from gambling at the Film Row Club as income and allowed no losses as balancing deductions. While, as will appear infra, we hold that the Film Row Club losses are to be allowed to the extent of Film Row Club gains, it does not follow that respondent was arbitrary in refusing to do likewise. The agent's testimony explaining the basis for the statutory notice (which is the only evidence in the record in relation thereto) is to the effect that losses were disallowed because they were unsubstantiated, and also because taxpayer was on the cash basis and, assuming the losses were paid, the year or years of payment had not been shown. We think both views are tenable. *100 It is clear that respondent, in the exercise of his judgment in making his statutory determination, may properly place the burden on the taxpayer of establishing all of the elements upon which the right to deductions is based. See ; ; A holding by this Court, on the record before us, disagreeing with some part of respondent's determination is not of itself equivalent to a finding that the determination was arbitrary. See (C.A. 7, 1957), affirming . If the rule were otherwise, we would find it necessary to invalidate, in toto, every determination with which we did not wholly agree. Such a view would emasculate the well established rules relating to the burden of proof and seriously undermine the effect of the statutory notice upon which the principle of the burden of proof is founded in the usual situation. Although we hold, infra, that respondent erred in failing to allow *101 gambling losses to the extent of gambling gains, petitioner has not been prejudiced thereby because we have made such allowance (see discussion, infra). On the other hand, however, as will also appear infra, we think respondent was clearly right in disallowing the excess of gambling losses over gambling gains. Petitioner next urges that respondent was arbitrary in treating deposits as gross income, but failing to allow any deductions or eliminations for "pay outs." Petitioner argues that respondent must have known that the very nature of petitioner's business was such that pay outs were necessary. As will appear infra, we have materially reduced respondent's determination. Again, however, this is not tantamount to a holding that the determination was arbitrary or invalid in whole or in part. Petitioner did not offer any substantiation of pay outs. He did not maintain any records from which pay outs could be calculated. The fact that his failure to do so was because of fear that they might be found by police authorities, and used in the prosecution of petitioner, and others operating illegal enterprises is hardly binding upon (or in any sense appealing to) respondent or to us. Inability *102 to meet the burden of proof on the part of the petitioner does not shift the burden to respondent. It merely leaves petitioner with an unenforceable claim ( Burnet v. Houston, supra, p. 1930) due, in this instance at least, to his own culpable failure to keep records. With respect to respondent's failure to reduce deposits (treated as gross income) by any unsubstantiated amounts of pay outs, we need not repeat our reference to the authorities referred to supra dealing with the burden of proof except to recall that in , the Court referred to the fact that in the absence of books and records, the Commissioner was justified in treating the bank deposits as gross income "with the burden resting upon the taxpayer to show what amounts, if any, were nontaxable income, * * *." [Italics supplied.] It should be noted, also, that respondent based his determination of increases in business income solely on deposits and undeposited checks endorsed by petitioner (plus Film Row Club gains without offsetting losses). It is clear from the record, however, that petitioner received very substantial amounts in cash which he did not deposit. Respondent, *103 however, did not include any of such cash in determining unreported business income. Petitioner refers to the fact that respondent's determination was based in material respects upon third party records. This, of course, was necessary in part because petitioner, in his business of betting commissioner, maintained no records of commissions earned, bets placed, gross receipts or pay outs, and, in part, because petitioner's counsel refused to turn over to the investigating agent those records which were available. (We are not questioning the reason, wisdom or justification for this refusal. We consider only the fact that the records were not turned over.) The respondent, however, is not required to make his determination on the basis of evidence legally admissible in a formal proceeding in court. Moreover, and particularly where the taxpayer fails to keep proper records available for audit, respondent must be given latitude (short, of course, of arbitrary action on his part) in the use of such investigative techniques as the circumstances afford. It is clear that where petitioner asserts the invalidity of a determination, the burden is on him to establish such invalidity. In this *104 connection, in (C.A. 9, 1943), affirming this Court's decision in , the Court of Appeals said (p. 919): "'Unquestionably the burden of proof is on the taxpayer to show that the Commissioner's determination is invalid.' ( * * *), which burden is sustained by a clear showing that the determination was arbitrary or erroneous. * * *" Later (p. 922) the Court said: "Petitioner has failed to overcome the presumption of validity attaching to the determination of the Commissioner, * * *" On the basis of the foregoing discussion, we hold that respondent's determination was not arbitrary or invalid. Understatements It is well settled that the burden of proof rests with petitioner to establish error in respondent's determination of a deficiency. In (C.A. 9, 1957), affirming *105 , the Court of Appeals said: "Petitioner, having invoked the jurisdiction of the Tax Court, entered the hearing burdened with the duty of establishing by at least a preponderance of the evidence that the determination made by the Commissioner was erroneous. * * *" See also We turn first to gains and losses from gambling at the Film Row Club. The amounts won and lost in 1948 and 1949 are set forth in our Findings. In each of the two years, the losses exceeded the gains. Respondent included the gains in gross income, but allowed no loss deductions. The information as to both gains and losses was furnished the investigating agent from records of the club and was received in evidence without objection. The agent frankly admitted that there was just as much reason to accept the record of losses as the record of gains. He appeared to have no doubt that both were correct, and made no suggestion that petitioner was in any way connected with, or had any interest in the club. The agent's real reason for disallowance of losses was that petitioner was on a cash basis, and the agent did not have information as to the *106 year in which the losses were paid. We think, however, that we are justified in inferring that, to the extent the losses equalled the gains, the one was offset against the other and that separate payment of the losses was to that extent unnecessary. Accordingly, we allow the losses to the extent of the gains in 1948 and 1949. (The issue does not arise with respect to 1950.) We agree with respondent, however, in his refusal to allow any deduction for the excess of losses over gains. Here there is neither evidence of payment nor the year of payment. We hold, therefore, that deduction of the excess of losses over gains is not allowable. On the question of petitioner's understatements of income as betting commissioner, we face a difficult task. We have no doubt from the record that the understatements for each year involved are quite substantial. It is, of course, impossible to determine such understatements with anything like accuracy or precision from this record. While the burden of proof is on petitioner, and the impossibility of accurate determination is engendered by petitioner's failure to maintain essential records for this phase of his business, we must deal with him as fairly *107 as the circumstances which he has created will permit, and in spite of the fact that the fault is his. We recognize that, as betting commissioner, petitioner must have had substantial pay outs, but again we have no basis for calculating the amount thereof. At the same time, if we were merely to sustain respondent's determination, we think the result would obviously be harsh and unrealistic. We think our only proper course is to approach the problem indirectly by analysis of the record in the light of the principles established in (C.A. 2, 1930). Our objective will be, after resolving any reasonable doubts against petitioner, to reconstruct his gross income as betting commissioner at a figure which in our judgment it would be unlikely to exceed in fact. (Petitioner, it is clear, has failed to establish a lesser amount.) In (C.A. 9, 1949), affirming , the Court of Appeals said (p. 226): "The petitioner had kept no books. So the Tax Court had to determine the amount from such evidence as was presented to them. If the result is an approximation, *108 the lack of exactitude is traceable to the petitioner's own failure to keep accurate account. As said by the Court of Appeals for the Second Circuit: "Absolute certainty in such matters is usually impossible and is not necessary; the Board should make as close an approximation as it can, bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making." . * * *" In the instant case, we make no pretense at precision. We merely do our best to circumscribe the results within practical limits by the exercise of our judgment within the scope of the principles announced in , and The figures of gross income at which we arrive infra are substantially less than those determined by respondent. Respondent does not question petitioner's deductions. In the year 1948, petitioner's deposits in his commercial account totalled over $500,000. Of this amount, the cash deposits were only a little over $400. It is clear that the remaining deposits largely represented remittances from out-of-town betting commissioners with whom petitioner "laid off" *109 bets when he could not find local bettors to take the opposite side of bets which were offered to him. It must be remembered that petitioner rarely acted as bookmaker (and then only of necessity) so that when one of his customers desired to place a bet, it was necessary for him to procure a customer betting the other way, or lay off the bet with another betting commissioner. We must also remember that the bets placed locally (representing a substantial part of his business) were largely cash transactions, while the bets laid off with out-of-town betting commissioners were largely settled for by check or money order. Petitioner's deposits, therefore, were largely representative of the settlement of bets laid off with out-of-town commissioners, or the settlement of bets which they laid off with him. The credit balance could be in either direction, and took into consideration wins, losses, and commissions. These deposits, however, obviously did not represent all of the bets laid off. They represented not the result of an individual bet, but a settlement of accounts which usually represented the net result from the placing of more than a single bet. Moreover, in 1948, petitioner received *110 checks in excess of $120,000 which he either cashed or endorsed to others. These checks likewise represented net figures in the settlement of accounts involving a number of bets rather than a single bet. In addition, petitioner issued substantial checks, largely to out-of-town betting commissioners, representing the settlement of accounts where the net credits were in their favor. The amount of such checks for 1948 is not in the record, but the total of such checks in 1950 exceeded $290,000 and it appears from petitioner's proposed Finding No. 50 and respondent's proposed Finding No. 83 that both parties are satisfied that the same general pattern of payments by check existed in 1948 and 1949. The total of checks deposited, checks cashed or endorsed, and checks issued represents a minimum of layoff bets, because, as already indicated, they represented settlement of accounts arising out of more than one bet. The total of layoff bets, therefore, must have materially exceeded such total. Before turning to local bets, we note at this point that in laying off bets with other betting commissioners, petitioner normally received only one-half of the commissions. Sometimes he received *111 none at all, but he cannot estimate how often this occurred. Moreover, we note that the normal commission (before splitting) was 5 per cent on events other than horse races, while in horse racing, although the normal commission was likewise 5 per cent, only the loser paid a commission. Petitioner was unable to estimate what proportion of the bets were on horse racing. So far, however, we have discussed only layoff bets with out-of-town betting commissioners. Since such layoffs, when placed by petitioner, only occurred when he already had bets, but had not found a customer betting the other way to balance off his risk, it is clear that he must have placed local bets (handled largely in cash) in totals at least as large as the total of layoff bets. (When out-of-town betting commissioners laid off bets with him, he conversely placed balancing bets with his own customers or other commissioners.) On the bets placed with his own customers, there was no splitting of commissions. Even the above-described practices do not paint the full picture. A substantial part of his business was the placing of bets locally. Petitioner could not estimate the proportions of local to out-of-town business. *112 Except in instances such as those described above, where he couldn't place balancing bets with his own customers, and laid them off with other commissions, he accepted bets from local customers and offset them substantially by placing balancing bets with other local customers who were willing to risk their money by betting the opposite way. Here, he received full commissions of 5 per cent from both parties (except that in horse race bets only the loser paid commissioners) and did not split them with anyone else. It is clear from the record that this was a large part of his business. Occasionally, he was unable to collect from a loser, but this seldom happened, because, as he testified, he watched his credits closely. We have given painstaking care to the foregoing. We fully realize that much is lacking. We have reconciled and intergrated the elements as best we can by the use of our own judgment. We conclude, with respect to 1948, that it is not likely that petitioner received gross commissions as betting commissioner in excess of $167,000, and that petitioner has failed to establish a lesser amount. From this, we subtract the gross income of $56,795.13 of the Kingston Club reported *113 by petitioner in his income tax return, and we find a net understatement of income as betting commissioner for 1948 in the amount of $110,204.87. Other items of income (including the small item of omitted interest) and deductions claimed by petitioner on his return are not in dispute. Again we recognize that our finding of petitioner's net understatement of gross commissions as betting commissioner represents merely such an approximation as we may glean from the vague and meager record beofre us. To the extent that our approximation approaches accuracy, however, it necessarily gives indirect effect to the allowance of pay outs. What we have said with respect to income as betting commissioner in 1948 applies in substance to 1949 as well, and we need not repeat our discussion in full. In 1949, the deposits in petitioner's commercial account totaled over $400,000. Of this amount, the cash deposits were only a little over $8,400. The remaining deposits were largely remittances from out-of-town betting commissioners. Undeposited checks which were either cashed or endorsed to others totaled over $107,000. Again, it appears that substantial checks were issued by petitioner, largely *114 to other betting commissioners, in settlement of accounts where the net credits were in their favor. The amount of such checks is not established for 1949 but (as stated above with respect to 1948) the total checks in 1950 exceeded $290,000 and both parties appear satisfied that the same general pattern of payments by check existed in 1949. Here also the total of checks deposited, checks cashed or endorsed, and checks issued pictures a minimum of layoff bets since they represent in the main settlement of accounts arising out of more than one bet. Once more it is apparent that the total of the layoff bets must have materially exceeded such total. With respect to local bets, what we have said in relation to 1948 applies equally to 1949. From all of the foregoing, we have concluded that it is not likely that petitioner received gross commissions in 1949 in excess of $145,000 and that petitioner has failed to establish a lesser amount. Subtracting gross income of $66,274.91 of the Kingston Club reported by petitioner in his income tax return, we find a net understatement of income as betting commissioner for 1949 in the amount of $78,725.09. What we have said concerning other income *115 and expenses and also, with respect to indirect allowance of pay outs for 1948, applies to 1949 as well. The picture does not change in principle in 1950, and we need not repeat our earlier discussion. Deposits in petitioner's commercial bank account totaled over $283,000, of which about $13,950 was deposited in cash. Undeposited checks which were either cashed or endorsed to others totaled $22,613.75. Checks largely issued to other betting commissioners totaled in excess of $290,000. Again there was a settlement of accounts, so that the total layoff bets must have exceeded the total of checks deposited, checks cashed or endorsed, and checks issued to betting commissioners. What we have said about local bets again applies to 1950. As to 1950, we have concluded that it is not likely that petitioner received gross commissions in excess of $108,000 and that petitioner has failed to establish a lesser amount. Subtracting therefrom gross income from business in the amount of $8,207.71 reported by petitioner in his amended income tax return for 1950, we find a net understatement of income as betting commissioner for 1950 in the amount of $99,792.29. What we have said with respect to *116 other income and expenses, and indirect allowance of pay outs for 1948 and 1949 applies also to 1950. The gross income and understatements determined by us with respect to petitioner's activities as betting commissioner for each of the years in question include any income or loss from the Kingston Club card room. No separate income or loss from the card room operation has been reliably established. Petitioner's counsel argue on brief that petitioner, as a well known betting commissioner, was in a sense a trustee for the betting public, that his character is unblemished, his veracity not open to question and that his credibility is in no sense affected by the fact that he was engaged in an illegal business. It is argued, therefore, that we should accept his testimony that his returns, as prepared for him by his accountant, were true, correct and honest, leading to the conclusion that we should find no deficiencies. We see no occasion to discuss the validity of the tradition of the honest gambler or whether, if valid, it extends to reporting of income for tax purposes. As will appear from our discussion infra, we think it is clear from the record that petitioner had substantial income *117 in each of the years in question in excess of what he reported, and that he was well aware of it. The data for petitioner's income tax returns for the years in question was prepared by the accountant Murton or under his direction by someone in his organization. The information, when assembled, was turned over to the accountant Calegari, who prepared the returns. The method of determining net income was described by the witness Evje (an accountant in Murton's organization) as follows: "The method used to arrive at what we will say is net income was to take - we had already itemized all deductible expenses. We take the beginning bank balance and subtract it from the ending bank balance, adding to that any personal withdrawals, all of these expenses as itemized, and the difference between the beginning and the ending were these adjustments which would constitute gross income. From this would be deducted this summary as submitted in evidence here to arrive at net income from the operations of the Kingston Club." Petitioner testified that he maintained a cash revolving fund of about $3,000. He stated that if the amount in the fund was depleted, he added cash. If it increased to an *118 amount substantially over $3,000, petitioner testified that the excess was deposited in his commercial bank account. Murton completely disregarded cash on the theory that the revolving fund was kept at approximately $3,000 and that any excess cash was deposited in the bank, and, therefore, reflected in Murton's calculation. Petitioner never furnished to Murton any information as to the amount of cash bets placed, cash receipts, cash disbursements, or cash commissions. It is clear from the record that a large part of petitioner's business was local, and that, in the main, the local transactions were settled in cash. The commissions on such local business were likewise received in cash or deducted from cash payments when settlements were made. There is no specific evidence in the record as to the amount of local bets placed by petitioner, but we think conservative estimate may be inferred from correlation with the amount of bets laid off with out-of-town betting commissioners. Bets were laid off with out-of-town commissioners largely when petitioner could not cover them locally. The transactions with out-of-town betting commissioners were largely by check or money order. Petitioner *119 received or paid checks depending upon whether the net credit was in the hands of the out-of-town betting commissioner or in his own hands. The checks or money orders were largely in settlement of accounts, and represented the net from total bets in excess of the amounts actually remitted. The record contains evidence of petitioner's total deposits, cash deposits, undeposited checks and checks issued by him to bettors. (The figure for checks issued is available only for 1950, but both parties suggest in their proposed findings that the same pattern existed in 1948 and 1949, in each of which years the deposits and undeposited checks exceeded those in 1950.) We think the foregoing furnishes a basis for an estimate or approximation of total out-of-town bets. As a corollary, it furnishes a basis for approximating local bets. Out-of-town bets were largely layoffs, which presupposes local bets of relatively the same total. Moreover, there were substantial local bets which were laid off locally, either with in-town customers or betting commissioners in the area. Keeping the above factors in mind, we think the record supports the inference (after due consideration of the variations in commissions *120 which we have already discussed) that petitioner received commissions from local bets in amounts not less than the following: 1948 - $69,000; 1949 - $60,000; 1950 - $44,000. Nevertheless, despite the fact that local bets were largely settled in cash, the total cash deposits in petitioner's commercial bank account for the entire three years were less than $25,000, the amounts per year being approximately as follows: 1948 - $430; 1949 - $8,470; 1950 - $13,955. We think it apparent upon consideration of all of the circumstances that large amounts of cash commissions in each of the years in question were not deposited in the bank and could not have been reflected in Murton's figures which disregarded cash or in petitioner's income tax returns based on Murton's data. It is no answer to suggest that all cash receipts (including cash commissions) were used for pay outs. Petitioner himself testified that he broke about even as a result of the few occasions on which he acted as bookmaker. He testified that the occasions on which he failed to collect from losers were likewise few (except for losses totaling about $25,000 from failure to collect from two losing bettors in 1950) because he watched *121 his credits closely. Except under these two circumstances, he did not shoulder the risk of the bet. His method of doing business necessarily resulted in an excess of total receipts over total pay outs, and the volume of his business, inferable from the record, and the rate of commissions (allowing for the variations which we have already recognized) were such that his total commissions for each year involved greatly exceeded those reported. Since the total commissions were obviously not reflected in his commercial bank account, the inference is clear that they were received and retained in cash. It is to be recalled also that in each of the years in question, petitioner "received and endorsed" a substantial total of checks which he did not deposit. Calegari's "Report on Lesly Cohen - January 1, 1948 to December 31, 1950," has the same defect as Murton's figures. Calegari, too, totally disregarded cash, in order to be consistent, (as he testified) with Murton. Calegari's calculation of net income is substantially based upon the same principles as those applied by Murton, except that Calegari eliminated from deductions certain personal expenditures which Murton had not found. Calegari's *122 net worth statement likewise disregards the factor of cash on hand as of the beginning and ending of the net worth periods. By the same token, because the facts were not presented to him, he did not and could not take into consideration annual increases in cash attributable to cash commissions. See (C.A. 5, 1956), affirming in part a Memorandum Opinion of this Court [; . However well intentioned, it is obvious that the calculations of Murton and Calegari do not establish petitioner's actual income as betting commissioner for any of the years in question, and are in no sense an answer to the conclusion we have reached supra that petitioner received substantial commissions in each of the years in question which were not reported in his income tax returns. Much is made of the fact that a prior examination made by Revenue Agent Parenti did not develop any substantial omissions of income. We think this to be of no significance. Parenti was making a routine examination and relied upon records from Murton's office. Murton himself was unaware of the income from cash commissions. *123 Parenti's examination and report were in no sense binding on respondent. Fraud We next consider the question of whether or not a part of the deficiency for each of the years 1948, 1949 and 1950 was due to fraud with intent to evade tax within the meaning of section 293(b). The burden of proof with respect to fraud is upon the respondent, and he must establish fraud on the part of petitioner by clear and convincing evidence. . It should be noted at the outset that our conclusions in these respects must be based upon consideration of the entire record properly before us, and that we are not limited to a consideration of respondent's affirmative evidence. ; Wallace H. Pettit [Petit], ; . We also recognize that in this, as in many fraud cases, the proof of fraud, if it is to be established, must depend in some respects upon circumstantial evidence. Fraudulent intent can seldom be established by a single act *124 or by direct proof of the taxpayer's intention. It is usually found by surveying his whole course of conduct and is to be adduced as any other fact from all the evidence of record and inferences properly to be drawn therefrom. . Our finding of an understatement in taxable income for each of the years for the purposes of the deficiencies involved was based in some respects upon petitioner's failure to meet his burden of proof. We recognize that respondent cannot meet his own burden of establishing fraud on the basis of petitioner's failure to discharge the burden of proving error in the determination of deficiencies, and we do not, of course, rest our finding of fraud on that basis. The existence of fraud with intent to evade tax must be affirmatively established by respondent. (C.A. 6, 1956); (C.A. 6, 1955), affirming in part a Memorandum Opinion of this Court [. After a painstaking analysis of all of the evidence in this case, and bearing in mind the above stated principles, we are convinced *125 that petitioner received taxable income during each of the years 1948, 1949 and 1950 from his activities as betting commissioner in excess of that reported on his returns for those years, and that in each of said years a part of the deficiency was due to fraud with intent to evade taxes. It is well settled that respondent, in sustaining his burden of proof of fraud, need not prove the precise amount of the deficiency attributable to such fraud, but only that a part of the deficiency is attributable thereto. (C.A. 7, 1948), certiorari denied . Taking into consideration the minimum volume of layoff bets indicated by the deposit of checks and money orders from out-of-town betting commissioners; undeposited checks and money orders from the same sources; checks of petitioner to betting commissioners; the fact that the remittances to and from petitioner usually represented the settling of accounts rather than individual bets; the added fact that petitioner's local cash business was a substantial part of his betting *126 commissioner activities, recognizing the percentages he received (and making allowance for splitting of commissions on out-of-town business, occasional foregoing of commissions, occasional losses, and the fact that petitioner received commissions on horse race bets only from the loser), we reach the conclusion that there was a substantial understatement of income on petitioner's return for each of the taxable years in question. We cannot, on the record before us, determine the precise amount of such understatements, and we are not required to do so. However, after resolving any doubts in this respect against respondent, with whom the burden of proof of fraud lies, we hold, upon our analysis of the record, that the understatements were substantial for each year before us. Our analysis likewise convinces us that a large part of the understatements in each of said years was attributable to petitioner's failure to include in his return the receipt of commissions in cash. In the light of the foregoing, we, of course, reject petitioner's testimony to the effect that his returns were honest, correct and complete because analysis of the record demonstrates the contrary. The testimony of *127 his accountants does not lead to a different view. They, being uninformed of the full facts relating to cash transactions, could not reflect income undisclosed to them in preparing his returns. Consistent understatement of income in substantial proportions is in itself persuasive evidence of fraudulent intent to evade taxes. (C.A. 6, 1940), affirming ; ; (C.A. 5, 1954), certiorari denied . Here, in addition, petitioner failed to maintain records of his cash transactions, or of the cash commissions earned in such transactions, and kept uninformed the accountants whom he employed to prepare the data for his returns and the returns themselves. Petitioner admits that his failure to maintain records of his transactions as betting commissioner was deliberate. The reason he assigns was to keep them from law enforcement officers on the lookout for illegal gambling activities. We have no *128 doubt that concealment from the tax authorities and evasion of taxes was a coordinate objective. If this were not so, he could readily have kept sufficient records to supply his accountants with information as to his earnings so that his income tax returns would have reflected his true income even though such records did not include the names of his customers and the other betting commissioners with whom he dealt. Petitioner was an educated man and could not have been unaware of his obligations as a taxpayer. We need not labor the question of whether or not Murton told petitioner that the internal revenue officer in San Francisco had advised him by letter that his accounting method was adequate for income tax purposes. Assuming that a responsible revenue official would write such a letter (which we doubt), there is nothing in the evidence to the effect that the tax authorities or Murton ever advised petitioner that it was not necessary for him to disclose to Murton the full amount of his commissions, or report them in his income tax returns. We think it clear, without going into further detail, that fraudulent intent to evade taxes must be inferred from petitioner's conduct as disclosed *129 by the record. The Supreme Court had occasion to consider the problem of inference of fraud from conduct in , and said, in this connection (p. 499): "By way of illustration, and not by way of limitation, we would think affirmative wilful attempt may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or cocuments, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal. If the tax-evasion motive plays any part in such conduct the offense may be made out even though the conduct may also serve other purposes such as concealment of other crime." [Italics supplied.] Upon the entire record, therefore, we hold that respondent has met his burden of proving that there was a deficiency for each year in question due at least in part to fraud with intent to evade tax, and that additions to tax under section 293(b) are to be applied for each of said years. Decision will *130 be entered under Rule 50. Footnotes
1. Petitioner, in his proposed Finding No. 50, and respondent, in his proposed Finding No. 83, take the position in effect that payments in unspecified amounts were made under similar circumstances in 1948 and 1949.↩